[No. A059875. First Dist., Div. Five. Nov. 15, 1993.]

ENVIRONMENTAL PROTECTION INFORMATION CENTER, INC.,
Plaintiff and Appellant, v.
STATE BOARD OF FORESTRY, Defendant;
PACIFIC LUMBER COMPANY, Real Party in Interest and Respondent.

**[Opinion certified for partial publication.\*]**

---

  \*Pursuant to California Rules of Court, rule 976.1(a), this opinion is certified for publication with the exception of sections I.B. and II.B.

**COUNSEL**

Rodney Richard Jones and Mark P. Harris for Plaintiff and Appellant.

Rawles, Hinkle, Carter, Behnke & Oglesby, Jared G. Carter, Frank Shaw Bacik and Cindee F. Mayfield for Real Party in Interest and Respondent.

**OPINION**

**PETERSON, P. J.**—The Environmental Protection Information Center, Inc. (EPIC) appeals from an order dismissing its purported "supplemental petition" for writ of mandate challenging the reapproval of a timber harvest plan (THP). EPIC objects to the dismissal on two procedural grounds. We find no merit to EPIC's contentions. In affirming the order of dismissal, we hold that, after an alternative writ of mandate is fully complied with by the respondent, the issuing court retains no continuing jurisdiction in such proceedings over the subject matter of the writ petition.

I. PROCEDURAL BACKGROUND AND FACTS

A. *The Alternative Writ of Mandate*

Real party in interest Pacific Lumber Company (P-L) submitted THP 1-90-237 HUM to respondent California Department of Forestry and Fire Protection (Forestry) on April 11, 1990. The THP proposed the logging of

154 acres of old-growth redwood and Douglas fir on a 237-acre site near Eureka. Forestry did not accept the THP for filing because it did not contain sufficient surveys of wildlife species potentially affected by the logging. The THP was resubmitted October 15, 1990.

Forestry disapproved the THP on January 30, 1991, on the ground that the plan did not include adequate studies of the potential impact of logging on the marbled murrelet.[1]

P-L appealed Forestry's denial of the THP to the State Board of Forestry (Board). On March 6, 1991, after hearing extensive testimony, the Board overturned Forestry's denial and approved the THP. The Board's "official response" to public comment indicated that while no murrelets were sighted on the THP site, they were known to be in the general vicinity. The Board concluded that the THP's proposals for mitigation of harm to any murrelets on site were adequate.

On March 26, 1991, EPIC and the Sierra Club challenged the approval of the THP by a petition for writ of mandate, naming the Board as respondent. The petition alleged, inter alia, that the THP failed to include adequate surveys for marbled murrelets potentially present on the plan site, and that the proposed mitigation measures were insufficient.

On July 26, 1991, the Board served an answer to the petition; it also served a "notice of nonopposition" to the issuance of the alternative writ. The matter came before Judge William F. Ferroggiaro, Jr., for hearing on August 5, 1991. The Attorney General, appearing as counsel for the Board, announced that the Board did not oppose the issuance of an alternative writ because it was prepared to set aside its approval of the THP. Counsel listed three reasons for the Board's position: (1) The Board had adopted in June emergency regulations for the protection of the marbled murrelet, including detailed survey requirements; (2) the marbled murrelet had on August 1 been listed as a "threatened species" by the California Fish and Game Commission; and (3) there was some suspicion on the part of the Board that so little was known of the murrelet that designing mitigation measures was not possible.

On August 6, 1991, the superior court issued an alternative writ of mandate, commanding the Board to set aside its March 6, 1991, decision

---

[1]The marbled murrelet, or Brachyrhamphus marmoratus, is a brown, robin-sized pelagic bird which depends on coastal old-growth habitat for nesting sites. A pelagic bird is one which lives at sea beyond the continental shelf, feeding on plankton, and returns to coastal redwood habitats only to nest. (11 Oxford English Dict. (2d ed. 1989) p. 446, col. 3.)

approving the THP or in the alternative to show cause why it had not done so. On September 11, 1991, the Board complied with the alternative writ by setting aside the approval decision "as commanded by" the superior court's alternative writ. The Board recited that "Final administrative action on [P-L's] appeal will be taken only after a public hearing at which [P-L] and the public will be afforded an opportunity to be heard. The [Board] will receive additional evidence on whether the proposed operation will provide adequate protection to wildlife in light of the listing of the Marbled murrelet by the California Fish and Game Commission and the adoption of emergency regulations by the [Board]." The public hearing was set for November 5, 1991.

On September 25, 1991, the Attorney General on behalf of the Board served a "return to alternative writ of mandamus," reciting that the Board "fully complied with the terms of the alternative writ by making an order setting aside its decision to approve THP-1-90-237 HUM."

Thereafter, the Board thoroughly reconsidered the plan with input from P-L and several government agencies. On March 13, 1992, the Board again approved the THP. In a detailed 10-page statement of findings, the Board approved the plan subject to four conditions subsequent, and concluded that "With the conditions imposed by the Board, . . . the plan reflects the best knowledge reasonably available about the murrelet. The Board believes it unreasonable to require [P-L] to forgo harvesting and wait until further, or different, mitigation and survey techniques are developed by the scientific community." The four conditions were (1) the conducting of preharvest surveys pursuant to the Pacific seabird protocols; (2) sharing that survey information with Forestry and the Department of Fish and Game; (3) monitoring for marbled murrelets during timber operations; and (4) postharvest surveys, also to be shared as per condition (2).

On September 18, 1992, EPIC filed a "supplemental petition for writ of mandate" in the same superior court proceeding (No. 91CP0244) in which the alternative writ had been previously issued and complied with. The "supplemental petition" was filed a full six months after the Board's decision to approve the THP. The Sierra Club, an original petitioner in action 91CP0244, was not named a petitioner in the supplemental pleading; Forestry and the Department of Fish and Game were added as additional respondents.

Also on September 18, Judge Ferroggiaro issued a temporary restraining order against further timber operations. On September 21, P-L demurred to

the "supplemental petition," and filed a motion to strike and for judgment on the pleadings. P-L argued, inter alia, that the initial mandate proceeding had been concluded with the filing of the return showing full compliance with the alternative writ, and that in any case the new pleading was not filed within the 30-day limitations period for challenging a THP approval. (Pub. Resources Code, § 21080.5, subd. (g).)

B. *The Attempted Disqualification of Judge Ferroggiaro**

.   .   .   .   ■   .   .   .   .   .   .   .   .   .   .   .   .   .   .   ■   .   .   .   .   .   .

## II. DISCUSSION

A. *Full Compliance With an Alternative Writ of Mandate Divests the Issuing Court of Continuing Jurisdiction Over the Subject Matter of the Writ Petition*

As noted, we do not have a transcript of the October 9, 1992, hearing before Judge Hatch; we also lack a statement of reasons for his entry of the dismissal. The parties tacitly agree, however, that Judge Hatch dismissed the matter because EPIC could not file a "supplemental petition" in the old mandate action but had to file a new petition. EPIC contends that this was error.

Although the Board filed a return to the alternative writ indicating full compliance, the prior mandate proceeding was never formally dismissed as moot. EPIC takes this procedural anomaly and grafts it onto the authorities which give a court inherent, continuous jurisdiction to enforce a *peremptory* writ of mandate. (See, e.g., Code Civ. Proc., § 1097; *City of Carmel-by-the-Sea* v. *Board of Supervisors* (1982) 137 Cal.App.3d 964, 971 [187 Cal.Rptr. 379]; *Cartwright* v. *Swoap* (1974) 40 Cal.App.3d 567, 571 [115 Cal.Rptr. 402].) ■ The result of this combination is EPIC's contention that a court having issued an *alternative* writ somehow retains jurisdiction—by operation of law—to monitor future activity of an agency even though the alternative writ was fully complied with. Thus, EPIC claims it could legally have filed a "supplemental petition" in the old mandate proceeding to challenge the agency action after compliance which led to the reapproval of the THP.

EPIC presents no authority for this proposition, relying almost entirely on the cases vesting jurisdiction to enforce a peremptory writ. The jurisdiction to enforce a judgment of the court, however, is very different from some sort

---

*See footnote, *ante*, page 27.

of inchoate jurisdiction over a proceeding which is moot. It is clear that once the Board fully complied with the alternative writ, the initial writ petition had served its purpose and was moot; it is inexplicable that the petition was not formally dismissed. (See *Palma* v. *U.S. Industrial Fasteners, Inc.* (1984) 36 Cal.3d 171, 177-178 [203 Cal.Rptr. 626, 681 P.2d 893]; *Save Oxnard Shores* v. *California Coastal Com.* (1986) 179 Cal.App.3d 140, 149 [224 Cal.Rptr. 425].) Given full compliance with the alternative writ, no further judicial action could be taken save dismissal: Mandamus does not lie to compel that which is being done voluntarily. (*Bruce* v. *Gregory* (1967) 65 Cal.2d 666, 671 [56 Cal.Rptr. 265, 423 P.2d 193].)

EPIC's initial writ accomplished its purpose, the setting aside of the approval of the THP. At that point, the writ was moot and the Board was "going back to the drawing board." To accept EPIC's argument for some sort of "watchdog" jurisdiction invites a procedural open-endedness which is inconsistent with CEQA's general policies in favor of expeditious review. To paraphrase Justice Cardozo, "jurisdiction in the air will not do." (*Palsgraf* v. *Long Island Railroad Co.* (1928) 248 N.Y. 339 [162 N.E. 99, 59 A.L.R. 1253].)

The trial court's action was correct on a further ground. Whether EPIC could file a "supplemental petition" or was required to initiate a new mandate proceeding, it had to file something within 30 days of the March 13, 1992, reapproval of the THP. "Any action or proceeding to attack, review, set aside, void, or annul a determination or decision of a state agency, board, or commission approving or adopting a [THP] . . . shall be commenced no later than 30 days from the date of the filing of notice of the approval or adoption of the [plan]." (Pub. Resources Code, § 21080.5, subd. (g).) The Legislature has provided for such short limitations periods to "avoid delay and seek prompt resolution of CEQA claims." (*San Franciscans for Reasonable Growth* v. *City and County of San Francisco* (1987) 189 Cal.App.3d 498, 504 [234 Cal.Rptr. 527].)

EPIC's failure to comply with the 30-day statute of limitations barred its attack on the March 13, 1992, Board approval of the reconsidered THP. P-L repeatedly points this out and EPIC blithely ignores its procedural lapse. Given EPIC's failure to file a timely challenge to the reapproval, the appropriate label for its untimely challenge is academic.

B. *Judge Hatch Did Not Abuse His Discretion by Hearing Respondent's Demurrer and Motions**

. . . . . . . . . . . . . . . . . . . . . . . . . . . . .

## III. Disposition

The order dismissing the "supplemental petition" for writ of mandate is affirmed.

King, J., and Haning, J., concurred.

---

*See footnote, *ante*, page 27.