Filed 11/26/18

**CERTIFIED FOR PARTIAL PUBLICATION**[*]

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| ALLIANCE OF CONCERNED CITIZENS ORGANIZED FOR RESPONSIBLE DEVELOPMENT,<br><br>    Plaintiff and Appellant,<br><br>    v.<br><br>CITY OF SAN JUAN BAUTISTA et al.,<br><br>    Defendants and Respondents;<br><br>HARBHAJAN DADWAL,<br><br>    Real Party in Interest. | H044410<br>(San Benito County<br> Super. Ct. No. CU-14-00166) |

The Alliance of Concerned Citizens Organized for Responsible Development (ACCORD) filed a petition for writ of mandate and complaint for injunctive relief (petition) against the City of San Juan Bautista (City) and its city council (City Council) (together, respondents) to challenge the approval of a proposed project that consisted of a fuel station, convenience store, and quick serve restaurant on The Alameda near the intersection of State Route (SR) 156 and the adoption of a mitigated negative declaration (MND) for the project. Among other things, the petition sought to force respondents to vacate project approvals and compel the preparation of an Environmental Impact Report

_____

[*] Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of part III.

(EIR) under the California Environmental Quality Act (CEQA) (Pub. Resources Code, § 21000 et seq.).[1]

On March 14, 2016, the trial court granted a so-called "Peremptory Writ of Mandate of Interlocutory Remand for Reconsideration of Potential Noise Impacts" (March 2016 decision), which required respondents to set aside the resolutions, reconsider the significance of the project's potential noise impacts, take further action consistent with CEQA, and file a return to the writ.  ACCORD did not appeal from that decision.  It now appeals from the so-called "Final Judgment on Petition for Writ of Mandamus" subsequently filed on December 12, 2016 (December 2016 decision), which determined that respondents' supplemental return complied with the peremptory writ and with CEQA as directed.

On appeal, ACCORD argues that (1) the City was required to prepare an EIR because there was substantial evidence in the record supporting a fair argument that the proposed project may have significant, unmitigated traffic and noise impacts and that (2) the project violated the City's municipal code governing "formula retail businesses."

This court requested supplemental briefing to determine (1) whether the March 14, 2016 decision—which resolved all issues raised by the petition, granted a peremptory writ, and required a return—was in fact the final judgment, (2) whether the December 2016 decision was an order after judgment, and (3) the proper scope of appellate review.  We now conclude that the March 2016 decision was the final judgment and the December 2016 decision was a postjudgment order.  We consider ACCORD's

---

[1] All further statutory references are to the Public Resources Code unless otherwise specified.  All references to "Guidelines" are to the state CEQA Guidelines implementing CEQA (Cal. Code Regs., tit. 14, § 15000 et seq.)  "[C]ourts should afford great weight to the Guidelines except when a provision is clearly unauthorized or erroneous under CEQA.  [Citation.]" (*Laurel Heights Improvement Assn. v. Regents of University of California* (1988) 47 Cal.3d 376, 391, fn. 2.)

contentions insofar as they are cognizable in this appeal and find them meritless. Accordingly, we affirm the December 2016 decision.

I

*Administrative and Procedural History*

Harbhajan Dadwal (Dadwal), the real party in interest (RPI), filed an application for informal project review.

An Initial Study and Mitigated Negative Declaration (IS/MND), dated "January 2014," was prepared for the City concerning the proposed project.

A notice of intent to adopt a mitigated negative declaration (MND) was filed on January 14, 2014.

By resolution adopted on February 4, 2014 (Resolution 2014-04), the City's planning commission (Planning Commission) approved Dadwal's application for a design review permit (Design Review Project No. DR 2014-101) and his application for a conditional use permit (CUP 2014-101), subject to certain conditions and mitigation measures. By letter dated February 11, 2014, Leal Vineyards, Inc. appealed the Planning Commission's approvals.

A second IS/MND, dated July 31, 2014, concerning the project was prepared for City.

A comment letter received from the California Department of Transportation (Caltrans) on September 9, 2014 offered two comments. The first comment concerned "the need for an eastbound right turn channelization/turning lane" for traffic entering SR 156 from The Alameda. Caltrans stated in the letter: "Considering the speeds on SR 156 and the fact that this project will essentially double the amount of vehicle slowing in the through lane to navigate the turn (from existing 55 to 99 trips), these impacts are project-specific and should be mitigated prior to opening day of the project. This improvement is important for safety of the intersection since serious rear-end collisions can occur under these circumstances." The second comment concerned the requirement

3

of an encroachment permit. Caltrans's letter explained that "[a]ny work within the State right-of-way will require an encroachment permit issued from Caltrans." It stated that "[d]etailed information such as complete drawings, biological and cultural resource findings, hydraulic calculations, environmental reports, traffic study, etc., may need to be submitted as part of the encroachment permit process."

Another notice of intent to adopt an MND was filed on October 14, 2014.

By resolution adopted on November 18, 2014 (Resolution 2014-43), the City Council (1) made findings concerning CEQA, the second IS/MND, and the project and (2) approved the second IS/MND and the mitigation monitoring program. By a second resolution adopted on November 18, 2014 (Resolution 2014-44), the City Council (1) denied the appeal of Leal Vineyards, Inc., (2) approved the Planning Commission's approvals of Dadwal's applications for a conditional use permit and a design review permit, and (3) approved the project, subject to the conditions and mitigation measures imposed by the Planning Commission in its Resolution 2014-04, Exhibit C. In its second resolution, the City Council also made CEQA and project findings and approved conditions of project approval.

A notice of determination was filed on November 19, 2014.

On December 19, 2014, ACCORD filed its petition. It described the proposed project as follows: "[A]n ARCO gas station including 6 gas pumps, 12 fuel dispensing stations, a 2,980 square foot convenience store, and a 3,342 square foot fast food restaurant to be illuminated with lighted signs and open from 5 a.m. until 11 p.m. every day with daily truck deliveries."

The petition alleged multiple CEQA violations including that the City violated CEQA by not preparing an EIR because construction and operation of the project would cause significant environmental impacts. It also alleged that substantial evidence in the record showed that the project conflicted with the City's general plan and that in approving the project, the City violated state planning and zoning law, its own zoning

4

code, and its municipal code provision applicable to formula retail or restaurant businesses (San Juan Bautista Mun. Code, § 11-04-110).[2]

The petition sought a writ of mandate compelling the City to (1) vacate and set aside its 2014 resolution approving the project (Resolution 2014-44), (2) comply with CEQA, state planning and zoning law and its own general plan and municipal code, and (3) suspend all activity under the resolution that could affect the environment until such compliance. It also sought an injunction prohibiting the City and the RPI from "taking any action to implement or enforce the Resolution, including any action to begin grading or construction of the Project."

Hearings were held on the petition on February 8, 2016 and February 22, 2016. After the hearings, the court issued the March 2016 decision, which had been prepared by attorneys for the RPI.

The March 2016 decision indicated the trial court determined that the issue of potential noise impacts was severable pursuant to section 21168.9 and that the project and the challenged actions of respondents were otherwise "in compliance with CEQA." The decision found in favor of respondents and the RPI on all other "issues raised in the Petition."

The March 2016 decision compelled respondents to set aside Resolutions 2014-43 and 2014-44, and it directed respondents to reconsider the noise impacts of the proposed project, to determine whether any significant noise impacts could be mitigated to less than significant levels, to adopt any appropriate and feasible mitigation measures, and to adopt the appropriate environmental document or take other appropriate action consistent with CEQA. The decision also prohibited respondents from permitting, and the RPI from

---

[2] The City's municipal code defines "[f]ormula retail or restaurant business development" to mean "a retail, restaurant, or fast-food business that is required by contractual or other arrangement to maintain standardized services, merchandise, menus, ingredients, food preparation, uniforms, decor, logos, architecture, signs, or similar features." (San Juan Bautista Mun. Code, § 11-29-010.)

5

undertaking, any project construction activities that could result in any change or alteration to the physical environment until the resolutions had been "reconsidered" and "brought . . . into compliance with CEQA."

The March 2016 decision directed the City to take the following action: "CITY shall undertake such further studies and proceedings as may be necessary and appropriate to evaluate and consider the proposed Project's noise impacts on the environment, determine whether any such impacts that may be significant can be mitigated to less than significant levels, and if appropriate and feasible, adopt mitigation measures. Such compliance may take the ultimate form of adoption of a negative declaration, [an MND], [a] focused EIR, rejection of any of the above, or such other action consistent with CEQA as may be appropriate." The City was also directed to "comply with all notice and procedural requirements of CEQA, including an opportunity for public review, comment, and a hearing on any further action proposed by [the City]." It ordered respondents to file a return to the writ no later than October 10, 2016.

Respondents' supplemental return to the writ stated that respondents had filed a return to the writ prior to the return date of October 10, 2016 and that the supplemental return had been filed "to advise the court that the Project was approved after a public hearing on October 18, 2016." The supplemental return stated: "On April 19, 2016, the Respondents adopted Resolutions [*sic*] 2016 -21, setting aside Resolutions 2014-43 and 2014-44, which approved the Project. A new noise analysis for the project was prepared by Charles M. Salter Associates Inc. and completed on April 18, 2016. A new [IS/MND] was prepared, by Hatch, Mott, and McDonald on July 11, 2016, which incorporated the new noise analysis. The matter was fully and legally noticed and full rights were given by the public to participate in the process. After hearing all information presented by the public, the City Council at the hearing on appeal on November 18, 2014, after having reviewed all materials included with the agenda packet, heard and considered all comments and materials made and submitted by Petitioner, Applicant, staff, and other

6

interested parties approved the project and adopted Resolutions 2016-47 and 2016-48 approving the Project." The City requested entry of final judgment.

ACCORD filed its opposition and objections to the supplemental return and proposed final judgment. It argued that respondents' supplemental return did not demonstrate compliance with CEQA or the peremptory writ and that adoption of an MND was an abuse of discretion. ACCORD maintained that there was a fair argument that the project could potentially result in adverse environmental noise impacts and therefore, preparation of an EIR was required. The RPI filed a reply to ACCORD's opposition and objections.

The December 2016 decision stated that "at the February 22, 2016 hearing[, the trial court had] ruled in favor of RPI and Respondent on all matters presented by the Petitioner except for the issue of whether the project would produce noise impacts sufficient to produce an EIR." It recited that "[p]ursuant to this Court's Peremptory Writ, Respondent[s] set aside Resolutions 2014-43 and 2014-44 on April 19, 2016, and prepared a new noise analysis utilizing the traffic data from the traffic report in the previously adopted [MND]. The new noise analysis was prepared by Charles M. Salter Associates, Inc. and found the Project would not produce significant noise impacts, with mitigation measures. . . . A Revised [IS/MND] . . . was prepared by Hutch Mott MacDonald on July 11, 2016 which incorporated the new noise analysis and mitigation measures."

The December 2016 decision stated that "[i]n compliance with the terms of the Peremptory Writ, Respondent filed a Return to the Writ on October 10, 2016 stating that the Project was set for hearing on October 18, 2016 and that Respondent would inform the Court as to the action taken in that hearing via a supplemental return." It also recited: "After hearing and considering comments and materials submitted by the public, the Petitioner, the Applicant, staff, and other interested parties, and after reviewing all materials included in the staff report and agenda packet at the public hearing before the

7

City Council of San Juan Bautista on October 18, 2016, the City Council approved the project and adopted Resolutions 2016-47 and 2016-48. Resolution 2016-48 served to approve the project with conditions and appropriate mitigation measures[] and deny the appeal of the project, and Resolution 2016-47 served to adopt the Revised [IS/MND]."

The December 2016 decision stated that respondents had filed a supplemental return demonstrating compliance with the peremptory writ and CEQA. Although the court had already resolved the petition's allegations and granted a peremptory writ, it ostensibly "denied" ACCORD's petition for writ of mandamus and entered "[j]udgment" in favor of respondents and the RPI "in all matters." Attached as exhibits to the December 2016 decision were the new noise analysis prepared for the City, dated April 18, 2016, and the City's new resolutions (Resolutions 2016-47 and Resolution 2016-48).[3]

By notice of appeal filed on February 17, 2017, ACCORD appeals from the December 2016 decision.

II

*Cognizable Contentions on Appeal*

This court directed the parties and the RPI to address in supplemental briefing the following issues: (1) whether the March 2016 decision was the final judgment despite its label; (2) whether the December 2016 decision was a postjudgment order despite its label; and (3) whether ACCORD's contentions had been forfeited and are not cognizable

---

[3] By resolution adopted on October18, 2016 (Resolution 2016-47), the City Council approved a new IS/MND and a mitigation monitoring program. By a second resolution adopted on that same date (Resolution 2016-48), the City Council adopted CEQA and project findings, approved conditions of project approval, denied an appeal of the Planning Commission's approvals of the project, approved the Planning Commission's decision to approve applications CUP 2014-11 and DR 2014-11, and approved the project, subject to the conditions and mitigation measures imposed. Both resolutions contained a factual recital indicating that a new IS/MND had been prepared, which incorporated the new noise analysis.

8

on this appeal except insofar as they relate to whether the trial court erred in determining that respondents fully complied with its March 2016 decision.[4]

A. *Grant of the Peremptory Writ was the Final Judgment for Appeal Purposes*

"The right to appeal is wholly statutory. [Citation.]" (*Dana Point Safe Harbor Collective v. Superior Court* (2010) 51 Cal.4th 1, 5.) In general, a civil appeal may be taken "[f]rom a judgment, except an interlocutory judgment." (Code Civ. Proc., § 904.1, subd. (a)(1).) An appeal may also be taken from "an order made after a judgment made appealable by" Code of Civil Procedure section 904.1, subdivision (a)(1). (Code Civ. Proc., § 904.1, subd. (a)(2).)

In general, "[a] judgment is the *final* determination of the rights of the parties in an action or proceeding." (Code Civ. Proc., § 577, italics added.) Likewise, "[a] judgment in a special proceeding is the final determination of the rights of the parties therein."[5] (Code Civ. Proc., § 1064; see Code Civ. Proc., § 1109.) Writs of mandamus[6] are "special proceedings of a civil nature" governed by provisions in Part 3 of the Code of Civil Procedure. (See Code Civ. Proc., § 1084 et seq.; see also *Dhillon v. John Muir Health*, *supra*, 2 Cal.5th at p. 1115.)

"Under the one final judgment rule, ' "an appeal may be taken only from the final judgment in an entire action." ' [Citation.] ' "The theory [behind the rule] is that piecemeal disposition and multiple appeals in a single action would be oppressive and

---

[4] On this court's own motion, we strike the "Declaration of Zachary Walton" filed on behalf of ACCORD on the same date as its supplemental briefing and the "Declaration of Cody Phillips" filed on behalf of the RPI as part of his supplemental brief. Both were filed without this court's permission and went beyond the request for supplemental briefing. Respondents join in the RPI's supplemental brief.

[5] "[U]nless the statute creating the special proceeding prohibits an appeal, there is an appeal from a final judgment entered in a special proceeding. [Citation.]" (*Knoll v. Davidson* (1974) 12 Cal.3d 335, 343 [peremptory writ of mandate]; accord *Dhillon v. John Muir Health* (2017) 2 Cal.5th 1109, 1115.)

[6] A "writ of mandamus may be denominated a writ of mandate." (Code Civ. Proc., § 1084.)

9

costly, and that a review of intermediate rulings should await the final disposition of the case." ' [Citations.]" (*In re Baycol Cases I & II* (2011) 51 Cal.4th 751, 756.)

"It is not the form of the decree but the substance and effect of the adjudication which is determinative. As a general test, which must be adapted to the particular circumstances of the individual case, it may be said that where no issue is left for future consideration except the fact of compliance or noncompliance with the terms of the first decree, that decree is final, but where anything further in the nature of judicial action on the part of the court is essential to a final determination of the rights of the parties, the decree is interlocutory." (*Lyon v. Goss* (1942) 19 Cal.2d 659, 670; accord, *Griset v. Fair Political Practices Com'n* (2001) 25 Cal.4th 688, 698-699 (*Griset*).) "[A] judgment is final, and therefore appealable, ' " 'when it terminates the litigation between the parties on the merits of the case and leaves nothing to be done but to enforce by execution what has been determined.' " ' [Citation.]" (*Dhillon v. John Muir Health*, *supra*, 2 Cal.5th at p. 1115.) For example, "[a] decree in equity which is denominated 'interlocutory' and directs a further hearing for certain purposes, may make so complete and final an adjudication of all issues of fact and law as to constitute a 'final judgment' within the meaning of that term as used in the statutes concerning appeals." (*Lyon v. Goss*, *supra*, 19 Cal.2d at p. 669.)

A judgment labeled "interlocutory" nevertheless may be final for purposes of appeal if it is a final determination of the parties' rights. In *Eldridge v. Burns* (1978) 76 Cal.App.3d 396, the trial court issued a decision labeled " 'Interlocutory Judgment' " (*id.* at p. 402) which expressly stated that "[t]his is an interlocutory judgment and the court retains jurisdiction to resolve disputes between [the parties] . . . ." (*Ibid.*, fn. 1.) The appellate court observed that "[t]he mere fact that other proceedings were deemed necessary by the court to carry the judgment into effect did not render the judgment interlocutory rather than final." (*Id.* at p. 405.) It concluded that the so-called interlocutory judgment was an appealable final judgment because "there was nothing

10

further in the nature of judicial action on the part of the court essential to a final determination of the asserted rights of the respective parties" in that "[t]hose rights were fully established by the judgment." (*Ibid.*)

Contrariwise, an order labeled a " 'final judgment' " may not be a final judgment. "[N]o effect can or should be given to [a final judgment] label if the judgment does not *in fact* conclude matters between the parties. [Citation.]" (*Jackson v. Wells Fargo Bank* (1997) 54 Cal.App.4th 240, 244].) "It is the substance and effect of the court's order or judgment and not the label that determines whether or not it is appealable. [Citation.]" (*Art Movers, Inc. v. Ni West, Inc.* (1992) 3 Cal.App.4th 640, 645.)

"In its most fundamental sense, 'finality' is an attribute of every judgment at the moment it is rendered; indeed, if a judicial determination is not immediately 'final' in this sense it is not a judgment, no matter what it is denominated. The Legislature has incorporated this meaning of finality into the very definition of a judgment: 'A judgment is the *final* determination of the rights of the parties in an action or proceeding.' (Code Civ. Proc., § 577, italics added.)" (*Sullivan v. Delta Air Lines, Inc.* (1997) 15 Cal.4th 288, 304.) "Finality in this sense not only makes a judicial determination a judgment, it also makes that judgment appealable. . . . 'A judgment that leaves no issue to be determined except the fact of compliance with its terms is appealable.' [Citation.]" (*Ibid.*)

As indicated, "[a] judgment in a special proceeding is the final determination of the rights of the parties therein" (Code Civ. Proc., § 1064), and writs of mandamus are "special proceedings of a civil nature." (See Code Civ. Proc., § 1084 et seq.; see also *Dhillon v. John Muir Health*, *supra*, 2 Cal.5th at p. 1115.) A writ of mandate "may be either alternative or peremptory." (Code Civ. Proc., § 1087.) An alternative writ of mandate "command[s] the party to whom it is directed immediately after the receipt of the writ, or at some other specified time, to do the act required to be performed, or to show cause before the court at a time and place then or thereafter specified by court order

11

why he has not done so." (*Ibid.*)  In contrast, a peremptory writ of mandate commands a party to do the act required.  (*Ibid.*)

Where a petitioner seeks a writ of mandate, statutory law allows a peremptory writ to be issued in the first instance "if the application is upon due notice and the writ is allowed."  (Code Civ. Proc., § 1088.)  Thus, a peremptory writ is either preceded by issuance of an alternative writ or issued in the first instance.[7]  (See Asimow et al., Cal. Practice Guide: Administrative Law (The Rutter Group 2017) ¶ 20:210, p. 20-24; see also *id.*, ¶ 18:262, p. 18-37.)

In general, "[w]hen the trial court issues its judgment granting a peremptory writ, the respondent has two choices: to appeal that judgment or to comply with it."  (*Los Angeles Intern. Charter High School v. Los Angeles Unified School Dist.* (2012) 209 Cal.App.4th 1348, 1354.)  But if a writ petition has been joined with other causes of action and a decision leaves substantive issues or causes of action to be resolved in future proceedings, there may not be a final judgment yet.  (See *Griset*, *supra*, 25 Cal.4th at

---

[7] The issuance of an alternative writ of mandate contemplates responsive pleadings, including a return (by way of demurrer, a verified answer, or both) (Code Civ. Proc., § 1089; see *id.*, § 1089.5) and a reply (see *In re Scott* (1928) 205 Cal. 525, 526-527; see also Code Civ. Proc., § 1091; *Hunt v. Mayor and Council of City of Riverside* (1948) 31 Cal.2d 619, 623 [allegations of answer will be accepted as true if not controverted]), and a hearing and possibly evidentiary proceedings (see Code Civ. Proc., §§ 1087-1088, 1090, 1091, 1094; see also *Gomez v. Superior Court* (2012) 54 Cal.4th 293, 301).  If a petitioner prevails on an alternative writ, the trial court grants a peremptory writ of mandate (see Code Civ. Proc., § 1095).  When the respondent prevails, a court denies a peremptory writ and discharges the alternative writ.  (See Cal. Civ. Writ Practice (Cont. Ed. Bar 4th ed. 2018) § 9.48, p. 9-18; Cal. Judges Benchbook: Civ. Proc. After Trial (2017 ed.) Other Writ Proceedings in Superior Court, § 5.26, p. 352)  In the situation where a respondent performs the act required in the alternative writ before judgment, "the writ has accomplished the purpose of the mandamus proceedings and the petition should be dismissed as moot.  [Citations.]" (*Bruce v. Gregory* (1967) 65 Cal.2d 666, 671; see *Environmental Protection Information Center, Inc. v. State Bd. of Forestry* (1993) 20 Cal.App.4th 27, 28 ["after an alternative writ of mandate is fully complied with by the respondent, the issuing court retains no continuing jurisdiction in such proceedings over the subject matter of the writ petition"].)

pp. 696-697; see also *id*. at p. 699 ["denial of plaintiffs' petition for a writ of mandate disposed of all issues in the action" and was a final judgment]; *Morehart v. County of Santa Barbara* (1994) 7 Cal.4th 725, 743 ["an appeal cannot be taken from a judgment that fails to complete the disposition of all the causes of action between the parties even if the causes of action disposed of by the judgment have been ordered to be tried separately, or may be characterized as 'separate and independent' from those remaining"].)

The grant of a peremptory writ "may include a return date as a technique for ensuring compliance and closure." (Cal. Judges Benchbook: Civ. Proc. After Trial (CEJR 2017) Other Writ Proceedings in Superior Court, § 5.27, p. 353.) Although also called a "return," the return to a peremptory writ is different from a return to an alternative writ in that its purpose is to ensure that respondent took the actions required by the writ. (See 1 Cal. Civ. Writ Practice (Cont. Ed. Bar 4th ed. 2018) §§ 8.2, 9.42, 10.3-10.9, pp. 8-4, 9-17, 10-2 to 10-5; *Los Angeles Intern. Charter High School v. Los Angeles Unified School Dist.*, *supra*, 209 Cal.App.4th at p. 1355.) "Generally, the return to the peremptory writ will take one of two forms: that respondent has complied or that it has appealed or otherwise has grounds not to have complied." (Asimow et al., Cal. Practice Guide: Administrative Law (The Rutter Group 2017) ¶ 21:280, p. 21-35.) The fact that "there are additional proceedings involving the return on the [peremptory] writ does not change the finality of the judgment issuing the writ. [Citation.] The order following the hearing into the adequacy of [a respondent's] return on the writ is appealable as an order enforcing the judgment. [Citations.]" (*Los Angeles Intern. Charter High School v. Los Angeles Unified School Dist.* (2012) 209 Cal.App.4th 1348, 1354-1355.) "On appeal from an order discharging a [peremptory] writ, the issue is whether the trial court erred in ruling that the respondent . . . complied with the writ." (*Id*. at p. 1355.)

We note that the confusingly titled March 2016 decision ("Peremptory Writ of Mandate of Interlocutory Remand . . .") was prepared by the attorneys for the RPI. Its

13

label is seemingly self-contradictory because an *interlocutory* remand is not a final judgment, whereas the grant of a peremptory writ is ordinarily a final judgment unless there remain undecided claims or pending causes of action (such as where there is a combined pleading and the entire controversy is not resolved). (See *Griset*, *supra*, 25 Cal.4th at p. 697.) We now examine the substance and effect of the decision to determine whether it was the final judgment in this case.

The March 2016 decision disposed of all CEQA and non-CEQA issues raised by the petition and concluded that respondents had not complied with CEQA with respect to the potential noise impacts of the project. The decision was not tentative or partial. The March 2016 decision left for future determination only whether respondents had obeyed the peremptory writ, and they were required to demonstrate their compliance by a return. The issue to be determined at a future hearing was whether respondents' new actions complied with the peremptory writ, which required reconsideration of the project's potential noise impacts and compliance with CEQA going forward. Of course, the petition did not raise any claim of error regarding those new actions.

But the March 2016 decision itself stated that it was not the final judgment in the case. It stated that following the return, the court would "conduct such further proceedings as are necessary and appropriate and determine whether to enter a final Judgment." It further declared: "Nothing contained herein shall be construed as a final Judgment for purposes of appellate review by any party to this action."

The parties have not directed us to any California case holding that the subjective intentions of the court or the parties as to the finality of a decree can trump its actual substance and effect for purposes of appeal. Although the March 2016 decision had the effect of sending the matter back to respondents for further action and thus could be regarded as a remand in the most general sense, its self-description as a nonappealable, interlocutory remand was not determinative.

14

The substance and effect of the March 2016 decision, which granted a peremptory writ, compel our conclusion that it was the final judgment for purposes of appeal. (See *Griset*, *supra*, 25 Cal.4th at p. 700; see also *Dhillon v. John Muir Health*, *supra*, 2 Cal.5th at p. 1117; *Public Defenders' Organization v. County of Riverside* (2003) 106 Cal.App.4th 1403, 1410 [where rights put at issue by petition for writ of mandate had been adjudicated, the issue "[w]hether the County [was] complying with that judgment [granting a petition for writ of mandate] is not relevant to whether the judgment is final and appealable."].) While a trial court has continuing jurisdiction to ensure compliance with a peremptory writ of mandate (see *County of Inyo v. City of Los Angeles* (1976) 61 Cal.App.3d 91, 95; Code Civ. Proc., § 1097), the writ's validity is not at issue on appeal from an order enforcing the writ. (See *Robles v. Employment Development Department* (2015) 236 Cal.App.4th 530, 546.) The reviewing court's focus is on a respondent's response to the grant of the writ and "the trial court's assessment of that response. [Citation.]" (*Ibid*.)

In light of our conclusion, the December 2016 decision could not be the final judgment, regardless of its title. "[A]n order regarding adequacy of a return [is an order] relating to enforcement of a judgment" (*City of Carmel-By-The-Sea v. Board of Supervisors* (1982) 137 Cal.App.3d 964, 971), and it is appealable as an order after an appealable judgment. (*Ibid*.; see *Ballona Wetlands Land Trust v. City of Los Angeles* (2011) 201 Cal.App.4th 455, 464, fn. 2 (*Ballona*); Code Civ. Proc., 904.1, subd. (a)(2); *Leftridge v. City of Sacramento* (1941) 48 Cal.App.2d 589, 595 [order discharging peremptory writ was an appealable postjudgment order].) Accordingly, despite its label, the December 2016 decision was actually an appealable postjudgment order (Code Civ. Proc., § 904.1, subd. (a)(2)), which is most reasonably construed as an order discharging the peremptory writ.

15

B. *Interlocutory Remands*

ACCORD urges us to conclude that the March 2016 decision was an interlocutory remand order from which it could not appeal. ACCORD relies heavily on *Voices of the Wetlands v. State Water Resources Control Bd.* (2011) 52 Cal.4th 499 (*Voices*), a non-CEQA, administrative mandamus action (Code Civ. Proc., § 1094.5). In *Voices*, the trial court ordered an interlocutory remand to a regional water board, requiring it to reconsider a finding. (*Voices*, *supra*, 52 Cal.4th at pp. 511-513, 535.) ACCORD has not shown by reference to the record that review by petition for writ of administrative mandamus was available to review respondents' challenged actions.[8] (See Code Civ. Proc., 1094.5, subd. (a).)

In *Voices*, "the administrative record did not support one finding by the agency in support of its issuance of a permit essential to the permittee's operations." (*Voices*, *supra*, 52 Cal.4th at p. 535.) The California Supreme Court concluded that the trial court could properly order a limited, prejudgment remand to allow the administrative agency to reconsider its findings that lacked sufficient evidentiary support and the agency could consider additional evidence upon remand. (*Id.* at p. 526; see *id.* at pp. 530 ["no error in the trial court's use of an interlocutory remand to resolve perceived deficiencies" in regional water board's finding], 535 [trial court "acted properly by remanding to the agency for additional evidence and analysis"].)

In *Voices*, the Supreme Court stated that "properly understood and interpreted, subdivisions (e) and (f) of section 1094.5 impose no absolute bar on the use of

---

[8] The inquiry in an administrative mandamus proceeding "extend[s] to the questions whether the respondent has proceeded without, or in excess of, jurisdiction; whether there was a fair trial; and whether there was any prejudicial abuse of discretion." (Code Civ. Proc., § 1094.5, subd. (b).) "Abuse of discretion is established if the respondent has not proceeded in the manner required by law, the order or decision is not supported by the findings, or the findings are not supported by the evidence." (*Ibid.*)

16

prejudgment limited remand procedures such as the one employed here."[9] (*Voices*, *supra*, 52 Cal.4th at p. 526.) The court disapproved two cases (*Sierra Club v. Contra Costa County* (1992) 10 Cal.App.4th 1212; *Resource Defense Fund v. Local Agency Formation Com.* (1987) 191 Cal.App.3d 886) to the extent they concluded that section 1094.5, subdivision (f), imposed a "blanket prohibition on the appropriate use, in an administrative mandamus action, of a prejudgment remand for agency reconsideration of one or more issues pertinent to the agency's [quasi-judicial] decision." (*Voices*, *supra*, 52

---

[9] Section 1094.5, subdivision (e), provides that "[w]here the court finds that there is relevant evidence that, in the exercise of reasonable diligence, could not have been produced or that was improperly excluded at the hearing before respondent, it may enter judgment as provided in subdivision (f) remanding the case to be reconsidered in the light of that evidence; or, in cases in which the court is authorized by law to exercise its independent judgment on the evidence, the court may admit the evidence at the hearing on the writ without remanding the case." Section 1094.5, subdivision (f), states: "The court shall enter judgment either commanding respondent to set aside the order or decision, or denying the writ. Where the judgment commands that the order or decision be set aside, it may order the reconsideration of the case in light of the court's opinion and judgment and may order respondent to take such further action as is specially enjoined upon it by law, but the judgment shall not limit or control in any way the discretion legally vested in the respondent." In *Voices*, the Supreme Court reasoned that "[o]n its face, subdivision (f) of section 1094.5 indicates the form of *final judgment* the court may issue in an administrative mandamus action" (*Voices*, *supra*, 52 Cal.4th at p. 526) and that "nothing in subdivision (f) of section 1094.5 purports to limit procedures the court may appropriately employ *before* it renders a final judgment." (*Ibid.*) The court construed subdivision (e) of section 1094.5 as "merely confirm[ing] that while, in most cases, the court is limited to the face of the administrative record in deciding whether the agency's decision is valid as it stands, in fairness, the court may consider, or may permit the agency to consider, extra-record evidence for a contrary outcome, if persuaded that such evidence was not available, or was improperly excluded, at the original agency proceeding. [Citations.]" (*Voices*, *supra*, 52 Cal.4th at p. 532.) It determined that section 1094.5, subdivision (e) did not "prevent the court, upon finding that the administrative record itself *lacks* evidence sufficient to support the agency's decision, from remanding for consideration of additional evidence" in the administrative mandamus proceeding. (*Id.* at p. 532.) It concluded that "when a court has properly remanded for agency reconsideration on grounds that all, or part, of the original administrative decision has insufficient support in the record developed before the agency, the statute does not preclude the agency from accepting and considering additional evidence to fill the gap the court has identified." (*Id.* at p. 526.)

Cal.4th at p. 529.)  The court also disapproved two other cases (*Ashford v. Culver City Unified* School Dist. (2005) 130 Cal.App.4th 344 and *Newman v. State Personnel Bd.* (1992) 10 Cal.App.4th 41) to the extent that their analyses were inconsistent with its conclusions that "once the court has reviewed the administrative record, and has found it wanting, section 1094.5 does not preclude the court from remanding for the agency's reconsideration in appropriate proceedings that allow the agency to fill the evidentiary gap." (*Voices*, *supra*, 52 Cal.4th at p. 535.)

In a separate concurring opinion in *Voices*, Justice Werdegar, joined by Chief Justice Cantil-Sakauye, recognized the limited scope of the court's decision. (*Voices*, *supra*, 52 Cal.4th at pp. 539-540.)  Both justices had concurred in the majority opinion. The concurring opinion stated that "the majority has no occasion here to consider whether a trial court may, similarly, order remand for reconsideration of an agency decision for compliance with CEQA without issuing a writ of mandate." (*Voices*, *supra*, 52 Cal.4th at p. 539.)  It discussed section 21168.9, a CEQA provision that applies to CEQA challenges and requires a trial court to issue a peremptory writ if it finds that a public agency's finding or decision was made in violation of CEQA. (*Voices*, *supra*, 52 Cal.4th at pp. 539-540.)  It observed that "CEQA contains its own detailed and balanced remedial scheme" (*id*. at p. 540) and concluded that "the majority's analysis of the administrative mandate procedure in this non-CEQA case [did not] speak[] to the procedures to be followed when an agency's action is found to have violated CEQA."[10] (*Ibid*.)

---

[10] In *Highway 68 Coalition v. County of Monterey* (2017) 14 Cal.App.5th 883, this court "determine[d] that the issue of whether a proposed project is consistent with a county's general plan is not a CEQA issue, and therefore the mandate procedures provided for CEQA violations at section 21168.9 [did] not apply." (*Id*. at p. 893.)  This court recognized that "an agency's decisions regarding general plan consistency are reviewed by ordinary mandamus." (*Id*. at p. 894.)  Based on *Voices*, this court then rejected a claim that "the trial court was not authorized to utilize the interlocutory remand procedure" with respect to "a discrete, non-CEQA issue of general plan consistency."

18

The California Supreme Court has not decided the propriety of an interlocutory remand in CEQA cases. "A party may seek to set aside an administrative decision for failure to comply with CEQA by petitioning for either administrative mandamus (Code Civ. Proc., § 1094.5) or traditional mandamus (*Id.*, § 1085). A petition for administrative mandamus is appropriate when the party seeks review of a 'determination, finding, or decision of a public agency, made as a result of a proceeding in which by law a hearing is required to be given, evidence is required to be taken and discretion in the determination of facts is vested in a public agency, on the grounds of noncompliance with [CEQA],' generally referred to as an 'adjudicatory' or 'quasi-judicial' decision. [Citations.] A petition for traditional mandamus is appropriate in all other actions brought 'to attack, review, set aside, void or annul a determination, finding, or decision of a public agency on the grounds of noncompliance with [CEQA]. [Citations.]"[11] (*Western States Petroleum Assn. v. Superior Court* (1995) 9 Cal.4th 559, 566-567 (*Western States*).); see §§ 21168, 21168.5, 21168.7.)

In a writ proceeding under CEQA, a mandate order must "be made by the issuance of a *peremptory writ of mandate* specifying what action by the public agency is necessary to comply." (§ 21168.9, subd. (b), italics added.) Under section 21168.9, "[i]f a court finds . . . that any determination, finding, or decision of a public agency has been made without compliance with this division, the court shall enter an order that includes one or

---

(*Id.* at p.895.) In this case, we have no occasion to reconsider whether an interlocutory remand is an appropriate order in a non-CEQA traditional mandate proceeding.

[11] "In a CEQA case, as in other mandamus cases, [appellate] review of the administrative record for error is the same as the trial court's; we review the agency's action, not the trial court's decision. [Citations.]" (*Muzzy Ranch Co. v. Solano County Airport Land Use Com.* (2007) 41 Cal.4th 372, 381.) "[J]udicial review of agency decisions under CEQA is governed by sections 21168 (administrative mandamus) and 21168.5 (traditional mandamus)." (*Laurel Heights Improvement Assn. v. Regents of University of California* (1993) 6 Cal.4th 1112, 1135, italics omitted; see *Laurel Heights Improvement Assn. v. Regents of University of California* (1988) 47 Cal.3d 376, 392, fn. 5.)

19

more of the following:  [¶] (1) A mandate that the determination, finding, or decision be voided by the public agency, in whole or in part.  [¶] (2) If the court finds that a specific project activity or activities will prejudice the consideration or implementation of particular mitigation measures or alternatives to the project, a mandate that the public agency and any real parties in interest suspend any or all specific project activity or activities, pursuant to the determination, finding, or decision, that could result in an adverse change or alteration to the physical environment, until the public agency has taken any actions that may be necessary to bring the determination, finding, or decision into compliance with this division.  [¶] (3) A mandate that the public agency take specific action as may be necessary to bring the determination, finding, or decision into compliance with this division."  (§ 21168.9, subd. (a)(1)-(3).)

The grant of writ relief made pursuant to section 21168.9 must "include only those mandates which are necessary to achieve compliance with [CEQA] and only those specific project activities in noncompliance with [CEQA]."  (§ 21168.9, subd. (b).)  The order must "be limited to that portion of a determination, finding, or decision or the specific project activity or activities found to be in noncompliance only if a court finds that (1) the portion or specific project activity or activities are severable, (2) severance will not prejudice complete and full compliance with this division, and (3) the court has not found the remainder of the project to be in noncompliance with this division."  (*Ibid*.)

The statute states that trial court must "retain jurisdiction over the public agency's proceedings *by way of a return to the peremptory writ* until the court has determined that the public agency has complied with [CEQA]."  (§ 21168.9, subd. (b), italics added.)  "This statutory provision for the retention of jurisdiction reflects the rule that a court issuing a peremptory writ of mandate retains jurisdiction to determine the adequacy of the return and ensure full compliance with the writ.  [Citations.]"  (*Ballona, supra,* 201 Cal.App.4th at p. 479.)

20

While we question whether an interlocutory remand is permissible under section 21168.9, which requires relief (where warranted) by peremptory writ rather than by an alternative writ or order to show cause,[12] it is unnecessary to resolve the legal question here.  As explained, in substance and effect, the March 2016 decision was the final determination of the parties' rights—i.e., the final judgment, in this case.  (Code Civ. Proc., § 1064.)

C. *Scope of Review and Cognizable Issues on Appeal*

Code of Civil Procedure section 906 provides that "[u]pon an appeal pursuant to [s]ection 904.1 or 904.2, "the reviewing court may review the . . . decision and any intermediate ruling, proceeding, order or decision which involves the merits or necessarily affects the judgment or order appealed from or which substantially affects the rights of a party . . . ." (Code Civ. Proc., § 906.)  But Code of Civil Procedure section 906 makes clear that "[t]he provisions of this section do not authorize the reviewing court to review any decision or order from which an appeal might have been taken."

"California follows a 'one shot' rule under which, if an order is appealable, appeal must be taken or the right to appellate review is forfeited.  [Citations.]" (*Baycol, supra,* 51 Cal.4th at p. 762, fn. 8.)  Since the March 2016 decision was actually an appealable final judgment, "it follows that it had to be timely appealed or the right to challenge its particulars [was] forever lost." (*Ibid.*)

_____

[12] It is possible that this peremptory writ requirement precludes interlocutory remands.  (See *Muzzy Ranch Co. v. Solano County Airport Land Use Com.* (2007) 41 Cal.4th 372, 381 [courts "must bear in mind that '[t]he foremost principle under CEQA is that the Legislature intended the act "to be interpreted in such manner as to afford the fullest possible protection to the environment within the reasonable scope of the statutory language." ' [Citation.]"; see also *Lewis v. Superior Court* (1999) 19 Cal.4th 1232, 1265 (conc. opn. of Baxter, J.) ["The legislative authorization for issuance of a peremptory writ in the first instance reflects recognition that, on occasion, immediate judicial action is necessary to prevent or correct unauthorized or erroneous action by the respondent or to compel the respondent to act when required to do so."].)

By failing to appeal from the March 2016 decision, ACCORD forfeited appellate review of the trial court's findings under section 21168.9 and its other CEQA and non-CEQA determinations, express or implied, in favor of respondents.[13] A "trial court's retained jurisdiction under Public Resources Code section 21168.9, subdivision (b) is limited to ensuring compliance with the peremptory writ of mandate." (*Ballona*, *supra*, 201 Cal.App.4th at p. 480; see Code Civ. Proc., § 1097.) After considering a petitioner's CEQA challenges and "rendering a final judgment and peremptory writ of mandate, a trial court evaluating a return to the writ may not consider any newly asserted challenges arising from the same material facts in existence at the time of the judgment" because "[t]o do so would undermine the finality of the judgment." (*Ballona, supra,* at p. 480.)

We conclude that on appeal from the December 2016 decision, which is a post-judgment order, our review is limited to that decision. We lack jurisdiction to review the grant of the peremptory writ since it was the final judgment from which an appeal might have been taken. (Code Civ. Proc., §§ 904.1, subd. (a)(1), 906, 1064.) Accordingly, ACCORD's present claims that an EIR was required to address the potentially significant traffic impacts of the project and that the project violates the substantive requirements of the City's municipal code governing formula retail businesses (see San Juan Bautista Mun. Code, §§ 11-04-110, 11-29-010) are not cognizable. We may review, however, ACCORD's contentions insofar as they assert that, due to the project's potential noise impacts, preparation of an EIR was necessary to comply with the peremptory writ.

D. *Fairness and Due Process*

ACCORD also asserts that it was "entitled to rely upon the trial court's characterization of its [March 14, 2016] order as an interlocutory remand" and urges this court to recognize that the order was "a non-appealable interlocutory remand order" as a

---

[13] The court's grant of a peremptory writ applied only to ACCORD's CEQA claim regarding noise impacts and not to its other CEQA claims or its non-CEQA claims.

22

matter of fundamental fairness. The cases cited by ACCORD are not on point or are distinguishable.

As we have discussed, *Voices* was not a CEQA case. (See *Voices*, *supra*, 52 Cal.4th at p. 539 (conc. opn. of Werdegar, J.).) It did not consider whether an interlocutory remand is permissible under section 21168.9. Most relevant to this case, there was no occasion in *Voices* to consider whether the interlocutory remand order in that case was in fact a final judgment based on its substance and effect. "A decision, of course, is not authority for what it does not consider. [Citation.]" (*Mercury Ins. Group v. Superior Court* (1998) 19 Cal.4th 332, 348; see *People v. Gilbert* (1969) 1 Cal.3d 475, 482, fn. 7 ["It is axiomatic that cases are not authority for propositions not considered."].)

*Schenck v. County of Sonoma* (2011) 198 Cal.App.4th 949 (*Schenck*), which is mentioned by ACCORD, involved a plaintiff's "appeal from a judgment in an action challenging the approval of a [development] project . . . on grounds that the County of Sonoma failed to comply with [CEQA] before issuing [an MND]." (*Id*. at p. 952.) The plaintiff "challenged the County's compliance with CEQA and approval of the project by way of a petition for peremptory writ of mandate and injunctive relief filed in the trial court . . . ." (*Id*. at p. 955.) "[T]he trial court filed an order that found the County failed to furnish proper notice of the Board's intent to adopt the [MND] to the Bay Area Air Quality Management District ([BAAQMD])." (*Ibid*.) The trial court granted the petition, requiring a real party in interest "to provide adequate notice to the BAAQMD, with the 'results of such notice' to determine the 'further course of action' needed to 'cure the defects and ensure proper CEQA review of this project.' " (*Id*. at p. 956.) "The court retained jurisdiction over the matter to ultimately determine the issue of the County's compliance with the notice provisions of CEQA." (*Ibid*.)

*Schenck*'s recitation of procedural history mentioned that the plaintiff had "filed an appeal from the trial court's order," which the appellate court had dismissed. (*Schenck*, *supra*, 198 Cal.App.4th at p. 956.) According to the opinion, "the County filed

23

a 'Certificate of Compliance' . . . on April 29, 2010, which informed the court 'of the County's timely and complete compliance' with the order to provide proper notice to the BAAQMD, and requested dismissal of the petition for writ of mandate with prejudice." (*Ibid*.)  "The parties subsequently filed a stipulation that the County's Certificate of Compliance served as a return to the writ of mandate (Code Civ. Proc., § 1108), and to entry of the trial court's *prior order* as a 'final, appealable judgment' in the case. Pursuant to the stipulation, on July 19, 2010, the trial court issued a final judgment in the terms of the prior order."  (*Ibid*., italics added.)

On appeal in *Schenck*, the plaintiff sought to characterize "the trial court's order as 'an improper interlocutory remand,' and [the plaintiff] maintain[ed] that the court was 'required to set aside Project approval for failure to provide notice to a responsible agency.' " (*Schenck*, *supra*, 198 Cal.App.4th at p. 960.)  The Court of Appeal, First District, Division 1, found "nothing in the trial court's order that contravened the remedial procedures sanctioned by CEQA" in section 21168.9.  (*Id*. at p. 961.)  The appellate court also determined that the plaintiff had "forfeited any objection to the form of relief" by failing to object in the trial court.  (*Ibid*.)

We see nothing in *Schenck* that supports ACCORD's current claim that fundamental fairness and due process require this court to reach its challenges to the March 2016 decision, which we have concluded was the final judgment, on appeal from the trial court's subsequent December 2016 decision, which we have concluded is a post-judgment order determining the adequacy of respondents' return to the peremptory writ. While the Court of Appeal, First District, may have dismissed the plaintiff's original appeal in *Schenck*, for a reason we might only surmise, *Schenck* contains no holding that supports ACCORD's fairness argument.  An appellate decision is authority "only 'for the points actually involved and actually decided.' [Citations.]"  (*Santisas v. Goodin* (1998) 17 Cal.4th 599, 620.)

24

ACCORD asserts that if this court recharacterizes the March 2016 decision as a final judgment, ACCORD would be deprived of "its due process rights to full judicial review" and that fundamental fairness requires this court to hear its appeal from that decision. It cites two cases to support those assertions.

In *Adoption of Alexander S.* (1988) 44 Cal.3d 857 (*Alexander S.*), an adoption proceeding, a natural mother filed a petition to withdraw consent to an independent adoption, which the trial court denied. (*Id.* at pp. 859, 861.) The mother did not appeal from that denial "within the limitations period of the California Rules of Court" and it became final. (*Id.* at 859.) The mother timely appealed from the subsequent denial of "her petition to declare a father-child relationship." (*Id.* at p. 863.)

On appeal from the subsequent denial of her petition to declare a father-child relationship in *Alexander S.*, the mother raised "her belated claims" regarding the denial of her petition to withdraw consent. (*Alexander S.*, *supra*, 44 Cal.3d at p. 863.) "[O]n its own initiative and without notice to the parties," the appellate court treated the mother's belated claims as a petition for a writ of habeas corpus. (*Ibid.*) The appellate court "issued a writ of habeas corpus, ordered the trial court to vacate its judgment denying [the mother's] petition for withdrawal of consent" (*id.* at pp. 863-864), and denied the prospective adoptive parents' request to file a return to the writ. (*Id.* p. 864.)

On review in *Alexander S.*, the California Supreme Court determined that, since the mother had not appealed from the denial of her petition to withdraw consent, which was appealable, and did not file a petition for writ of habeas corpus in the appellate court, "[o]nce the Court of Appeal had addressed the issue of the father-child relationship, it should have stopped there and not addressed [the mother's] belated claims." (*Alexander S.*, *supra*, 44 Cal.3d at p. 864.) The court concluded that the appellate court had "erred in substituting habeas corpus relief for the available remedy of appeal" because "[i]t is well settled that 'habeas corpus cannot serve as a substitute for an appeal, and, in the absence of special circumstances constituting an excuse for failure to employ that remedy, the

25

writ will not lie where the claimed errors could have been, but were not, raised upon a timely appeal from a judgment . . . .' (*In re Dixon* (1953) 41 Cal.2d 756, 759.)" (*Id.* at p. 865.) The Supreme Court held that "habeas corpus may not be used to collaterally attack a final nonmodifiable judgment in an adoption-related action where the trial court had jurisdiction to render the final judgment." (*Id.* at pp. 867-868.)

*Alexander S.* is not helpful to ACCORD. The case does not, as ACCORD suggests, stand for the proposition that due process is "a valid consideration in determining whether procedural irregularities affect appellate jurisdiction" or may "under certain 'special circumstances,' " render "appellate review . . . proper regardless of the timeliness of the filing of a notice of appeal." When it mentioned "special circumstances" (*Alexander S.*, *supra*, 44 Cal.3d at p. 865), the Supreme Court was merely discussing the availability of habeas corpus relief and referring to the general rule that such relief is barred where a claim of error could have been, but was not, raised on direct appeal. (See *In re Reno* (2012) 55 Cal.4th 428, 490-491 [*Dixon* rule subject to four exceptions]; *In re Harris* (1993) 5 Cal.4th 813, 825, fn. 3, 829.)

In *Estate of Hanley* (1943) 23 Cal.2d 120, the appellant, in her individual capacity, filed a notice of appeal from an order approving the "First Account and Report" in the administration of an estate, but she filed it "one day beyond the applicable statutory period" for filing a notice of appeal. (*Id.* at p. 120.) The notice of entry of the order had misstated the date of filing, and an attorney acting for appellant in her separate capacity as executrix had served the notice upon appellant's counsel representing her in her individual capacity. (*Id.* at pp. 120-121.) In addition, during a telephone conversation, the attorney acting for her as the executrix told her counsel representing her as an individual that "the date stated in the notice was correct and the time for appeal should be computed accordingly." (*Id.* at p. 122.) The appellant opposed a motion to dismiss the appeal, asserting that "under appropriate circumstances, such as innocent and justifiable reliance upon misrepresentations, one may be relieved from the effect of delay in filing a

notice of appeal; or, adopting a different theory, the respondent whose misrepresentations were the cause of the delay may be estopped to take advantage of it by a motion to dismiss." (*Id*. at p. 122.)

The California Supreme Court was not persuaded by that argument. It stated: "[I]t is immaterial whether the misrepresentations concerning the date upon which the order was filed were wilful or inadvertent, whether the reliance thereon was reasonable or unreasonable, or whether the parties seeking to dismiss are acting in good faith or not. It may be assumed that the appellant has presented grounds for relief which would be sufficient if relief could be granted. But the requirement as to the time for taking an appeal is mandatory, and the court is without jurisdiction to consider one which has been taken subsequent to the expiration of the statutory period. [Citations.]" (*Estate of Hanley*, *supra*, 23 Cal.2d at pp. 122-123.) It further explained: "In the absence of statutory authorization, neither the trial nor appellate courts may extend or shorten the time for appeal [citation], even to relieve against mistake, inadvertence, accident, or misfortune [citations]. Nor can jurisdiction be conferred upon the appellate court by the consent or stipulation of the parties, estoppel, or waiver. [Citations.] If it appears that the appeal was not taken within the 60-day period, the court has no discretion but must dismiss the appeal of its own motion even if no objection is made. [Citations.]" (*Id*. at p. 123.) The Supreme Court dismissed the appeal. (*Id*. at p. 124.)

In dicta, the Supreme Court suggested that equitable relief from an untimely filing of an appeal from a judgment might be available where a party was prevented from timely appealing by another party's fraud or duress or "circumstances over which he has no control." (*Estate of Hanley*, *supra*, 23 Cal.2d at p. 124.) ACCORD relies on this language but overlooks a subsequent clarifying decision.

In *Hollister Convalescent Hosp., Inc. v. Rico* (1975) 15 Cal.3d 660, the Supreme Court made clear that the "notion of estoppel" has no "place in determining whether a timely notice of appeal has been filed within the jurisdictional period therefor." (*Id*. at

27

p. 674.)  The court stated that "[t]he expiration of a jurisdictional period is not, and by its nature cannot, be affected by the actions of the parties." (*Ibid*.)  It held that when a notice of appeal "has not in fact been filed within the relevant jurisdictional period—and when applicable rules of construction and interpretation fail to require that it be deemed in law to have been so filed—the appellate court, absent statutory authorization to extend the jurisdictional period, lacks all power to consider the appeal on its merits and must dismiss, on its own motion if necessary, without regard to considerations of estoppel or excuse." (*Ibid*.)

This court is not changing the character of the March 2016 decision.  We merely recognize its actual substance and effect as the final judgment.  The December 2016 decision was mischaracterized as the final judgment.

## III

### *The Project's Potential Noise Impacts*

ACCORD maintains that preparation of an EIR was required because the project's potential, unmitigated noise impacts may significantly affect the environment.

### A.  *CEQA*

"To ensure that governmental agencies and the public are adequately informed about the environmental impact of public decisions, [CEQA] requires a lead agency (*id.*, § 21067) to prepare an [EIR] before approving a new project that 'may have a significant effect on the environment.' (*Id*., § 21151, subd. (a).)" (*Friends of College of San Mateo Gardens v. San Mateo County Community College Dist.* (2016) 1 Cal.5th 937, 943 (*Friends*).)  " 'Significant effect on the environment' means a substantial, or potentially substantial, adverse change in the environment." (§ 21068.)  " 'Significant effect on the environment' " includes any substantial, or potentially substantial, adverse change in any of the physical conditions within the area affected by the project, including ambient noise.  (Guidelines, § 15382.)

28

An EIR is "the public document used by the governmental agency to analyze the significant environmental effects of a proposed project, to identify alternatives, and to disclose possible ways to reduce or avoid the possible environmental damage." (Guidelines, § 15002, subd. (f); see §§ 21002.1, 21061; *Banning Ranch Conservancy v. City of Newport Beach* (2017) 2 Cal.5th 918, 937.) " 'The EIR has been aptly described as the "heart of CEQA." [Citations.] Its purpose is to inform the public and its responsible officials of the environmental consequences of their decision before they are made.' [Citation.]" (*Friends of the Eel River v. North Coast Railroad Authority* (2017) 3 Cal.5th 677, 713.)

"Under CEQA and its implementing guidelines, an agency generally conducts an initial study to determine 'if the project may have a significant effect on the environment.' (CEQA Guidelines, § 15063, subd. (a).) If there is substantial evidence that the project may have a significant effect on the environment, then the agency must prepare and certify an EIR before approving the project. [Citations.] On the other hand, no EIR is required if the initial study reveals that 'there is no substantial evidence that the project or any of its aspects may cause a significant effect on the environment.' (CEQA Guidelines, § 15063, subd. (b)(2).) The agency instead prepares a negative declaration 'briefly describing the reasons that a proposed project . . . will not have a significant effect on the environment and therefore does not require the preparation of an EIR.' (*Id*., § 15371; see *id*., § 15070.) Even when an initial study shows a project may have significant environmental effects, an EIR is not always required. The public agency may instead prepare [an MND] if '(1) revisions in the project plans . . . before the proposed negative declaration and initial study are released for public review would avoid the effects or mitigate the effects to a point where clearly no significant effect on the environment would occur, and (2) there is no substantial evidence in light of the whole record before the public agency that the project, as revised, may have a significant effect

29

on the environment.'  (Pub. Resources Code, § 21064.5.)"  (*Friends*, *supra*, 1 Cal.5th at p. 945.)

"[W]hen an agency initially proposes a project, an EIR is required 'whenever it can be fairly argued on the basis of substantial evidence that [a] project may have significant environmental impact.'  [Citations.]"  (*Friends*, *supra*, 1 Cal.5th at p. 957.)  The Guidelines set forth the fair argument standard:  "If the lead agency determines there is substantial evidence in the record that the project may have a significant effect on the environment, the *lead agency* shall prepare an EIR [citation].  Said another way, if a lead agency is presented with a fair argument that a project may have a significant effect on the environment, the lead agency shall prepare an EIR even though it may also be presented with other substantial evidence that the project will not have a significant effect [citation]."  (Guidelines, § 15064, subd. (f)(1).)  The fair argument standard "applies by its terms to determinations of a *lead agency*, not of a court."  (*Berkeley Hillside Preservation v. City of Berkeley* (2015) 60 Cal.4th 1086, 1112 (*Berkeley Hillside Preservation*).)

Where no evidentiary hearing was required by law, courts review an agency's initial decision to adopt an MND rather than prepare an EIR for compliance with CEQA pursuant to section 21168.5 (see *Western States*, *supra*, 9 Cal.4th at pp. 567-568).  Such inquiry "extend[s] only to whether there was a prejudicial abuse of discretion." (§ 21168.5; cf. § 21168; Code Civ. Proc., § 1094.5, subd. (a).)  "Abuse of discretion is established if the agency has not proceeded in a manner required by law or if the determination or decision is not supported by substantial evidence."  (§ 21168.5.)

But "a reviewing court may not uphold an agency's decision [not to prepare an EIR under the fair argument test during its initial environmental review of a project] 'merely because substantial evidence was presented that the project would not have [a significant environmental] impact."  (*Berkeley Hillside Preservation*, *supra*, 60 Cal.4th at p. 1112; cf. *Friends*, *supra*, 1 Cal.5th 937.)  "The [reviewing] court's function is to

determine whether substantial evidence support[s] the agency's conclusion as to whether the prescribed "fair argument" could be made. If there [is] substantial evidence that the proposed project might have a significant environmental impact, evidence to the contrary is not sufficient to support a decision to dispense with preparation of an EIR and adopt a negative declaration, because it [can] be "fairly argued" that the project might have a significant environmental impact. Stated another way, if the [reviewing] court perceives substantial evidence that the project might have such an impact, but the agency failed to secure preparation of the required EIR, the agency's action is to be set aside because the agency abused its discretion by failing to proceed " in a manner required by law." ' [Citation.]" (*Berkeley Hillside Preservation*, *supra*, 60 Cal.4th at p. 1112.)

B. *Analysis*

ACCORD argues that the proposed project may create significant, unmitigated impacts and that, consequently, preparation of an EIR was required under CEQA. The implicit corollary argument is that the trial court should not have determined that respondents had complied with CEQA after reconsidering the project's potential noise impacts and that it should have determined that respondents' return did not comply with the peremptory writ. ACCORD broadly contends that "[t]he fact that the City was forced to prepare three MNDs simply confirms what ACCORD has been arguing for nearly four years – a Project of this scope in San Juan Bautista needs to have an EIR prepared in order to comply with CEQA."

The third IS/MND, dated July 11, 2016, explained the trial court's directive to reconsider the project's potential noise impacts. It stated: "As required by the Court, on April 19, 2016, the City adopted Resolution 2016-21, setting aside Resolutions 2014-43 and 2014-44, which approved the Project. . . . [T]he City undertook a new noise analysis using the current Project description. A new [IS/MND] was prepared using the new noise analysis."

31

In arguing on appeal that the project may create significant, unmitigated noise impacts, ACCORD directs us to the July 31, 2014 IS/MND, which was prepared by Hatch Mott MacDonald (HMM) (the second IS/MND),[14] the June 17, 2014 noise study (prepared by Environmental Consulting Services and incorporated into the second IS/MND as Exhibit E), and a couple of emails concerning that noise study.

The second IS/MND relied on the June 17, 2014 noise study and stated with respect to project-generated noise impacts that "[p]otentially significant increases in nearby traffic in the future for the receptor locations away from State Route 156 (particularly receptor locations 1 and 2) are represented by the noise levels in Exhibit 3 ([s]ee Appendix E)." It further stated that "[t]he anticipated increase in noise levels at receptor locations 1 and 2 would be very noticeable and potentially disturbing, although within the range of noise levels considered 'Conditionally Acceptable' for Low Density Residential uses (Exhibit 2 of Appendix E) by San Juan Bautista planning standards." The second IS/MND set forth a mitigation measure to address project-generated traffic noises: "Protection from project-related traffic noise at nearby receptors on The Alameda and adjacent to the site can be provided to some extent by appropriate noise wall protection. Noise walls or combination wall and landscape berm up to 6 feet high (6-feet maximum per zoning ordinance) of either double wood construction, masonry, Plexiglas, or glass, or some combination of these materials, around yards and on the south property line of the project, could reduce traffic noise levels 6-8 dB in the adjacent sensitive receptor areas."

The June 17, 2014 noise study stated that "[t]raffic volumes on the Alameda ha[d] been estimated for peak Cumulative Conditions ([in the year] 2035), which include[d] project-generated traffic and traffic increases by other approved projects in the area, in the HMM project traffic study . . . ." Exhibit 3 of the noise study showed the

_____

[14] The first IS/MND was prepared by the City's planning department.

existing traffic noise impacts and the cumulative traffic noise impacts from the project in terms of $L_{dn}$ (dBA) at three locations.[15]

A June 19, 2014 email, sent to the City's planning department from a senior project scientist working for HMM, offered comments on the noise study. It stated: "Mitigation for 'Cumulative Conditions' involves the construction of soundwalls [*sic*] at the residential homes. It states that they would reduce noise levels by 6 to 8 DB if constructed around the yards. I assume this would mean along the front yard. This may not be feasible considering it would significantly limit site distance for vehicles exiting those driveways along The Alameda (in proximity to Highway 156). Please note that this <u>could</u> potentially be considered a significant cumulative impact if the mitigation is not feasible." The message disclosed, however, that "HMM is updating the trip generation for the proposed project to account for an increase in the square footage of the convenience store, eliminating the drive through, etc." It pointed out that "the trip generation for the project as currently proposed is lower than the previous trip generation in the prior traffic analysis."

A July 3, 2014 email message, sent to the environmental consultant who produced the June 17, 2014 noise study from a senior project planner working for HMM, likewise stated that "[t]he trip generation for the project as currently proposed is lower than the previous trip generation in the prior traffic analysis," and it indicated that a "revised traffic analysis and exhibits" were attached to the email. It substantially

---

[15] The third IS/MND explains that $L_{dn}$ refers to the "Day-Night Average Sound Level," which is "[a] descriptor established by the U.S. Environmental Protection Agency to describe the average day-night level with a penalty applied to noise occurring during the nighttime hours (10 pm–7 am) to account for the increased sensitivity of people during sleeping hours." The new noise study explains that a "frequency weighting" system called " 'A'-weighting" "reflects the fact that human hearing is less sensitive at low frequencies and at extreme high frequencies relative to the mid-range" and that "[t]he unit of A-weighted sound level is sometimes abbreviated 'dBA.' "

reiterated the concern in the June 19, 2014 email message about the mitigation measure meant to address cumulative conditions.

HMM's updated traffic report, dated July 1, 2014, was attached as Exhibit F to the second IS/MND. The July 1, 2014 traffic report appears to have been completed after the June 17, 2014 noise study. The July 1, 2014 report revised project trip generation, project trip distribution, and by-pass trips (trips made to the site by traffic already on the surrounding street system) since the project description had changed since HMM's traffic report dated December 30, 2013.[16]

ACCORD now argues that there is no evidence in the record that (1) noise walls were a feasible mitigation measure, that (2) landscape berms or six-foot walls would be sufficient to reduce noise impacts to less than significant when the earlier noise study suggested noise walls "as high as 8 feet," or that (3) reducing noise impacts to some extent by appropriate noise wall protection would sufficiently mitigate "an otherwise significant impact." With respect to the alleged deficiencies in the second IS/MND and the June 17, 2014 noise study, ACCORD is fighting an old battle. As the result of the trial court's grant of a peremptory writ directing respondents to reconsider the project's potential noise impacts, a new noise study was conducted and a new IS/MND was prepared.

The third IS/MND relied upon the HMM's July 1, 2014 traffic report and upon a new noise study (dated April 18, 2016), which was incorporated into the third IS/MND as an appendix. The third IS/MND used the following thresholds of significance to

---

[16] The December 30, 2013 traffic report provided a traffic impact analysis for the earlier version of the project, which included "a gasoline/service station capable of servicing up to 16 vehicles at once," "an associated convenience store," and "a 74-seat fast-food restaurant with a drive-through window." That report had indicated that "the project would generate a net new 1,823 weekday daily trips . . . and 1,959 Saturday daily trips . . . ." The July 1, 2014 updated traffic report indicated that the revised project "would generate a net new 1,391 weekday daily trips . . . and 1,370 Saturday daily trips . . . ."

34

determine whether the proposed project would result in significant noise impacts: (1) "[a]n increase in the day-night average noise level ($L_{dn}$) of three decibels or greater at noise-sensitive receptors would be considered significant when projected noise levels would exceed those considered 'normally acceptable' for the affected land use" (fn. omitted) and (2) "[a]n increase of five decibels or greater would be considered significant when projected noise levels would continue to meet those considered satisfactory for the affected land use."

The third IS/MND stated: "Based on the existing traffic volumes and the increase in traffic volumes due to the project, an increase in traffic noise ($L_{dn}$) of up to two decibels was calculated along The Alameda in the vicinity of the project site. Further from the project site, the projected noise increase would be less. Increased traffic along SR 156 would increase nearby noise levels by less than one decibel. These noise increases are less than the three-decibel significance threshold. Therefore, there would be no significant noise impact from project-related traffic." (Fn. omitted.) No mitigation measures for project-generated traffic noise were proposed because it was determined that such noise would have a less than significant impact.

The new noise study, entitled "Noise Impact Assessment" (and attached to the third IS/MND as Appendix E), found that the project-generated traffic noise would result in a less than significant impact without mitigation. The noise study explained its analysis: "Measured traffic noise levels along the local roadways are above the 'normally acceptable' threshold of City and County guidelines for residential land uses. Future traffic noise levels will exceed this threshold as well. Therefore, our analysis of permanent traffic noise increases is based on relative noise increase."

The new noise study stated: "The traffic report for the project, prepared by [HMM], dated 1 July 2014, projects additional traffic volumes on adjacent roadways that would be associated with the project. We evaluated the projected project traffic volumes relative to the existing traffic volumes. We calculated that the project would

35

result in up to a two decibel increase in traffic noise ($L_{dn}$) along The Alameda in the vicinity of the project site. Further from the project site, the projected noise increase would be less. Increased traffic along SR 156 would increase nearby noise levels by less than a decibel. These noise increases are less than the significance threshold of a three decibel increase. Therefore, there would be no significant noise impact from project-related traffic." (Fn. omitted.) It also stated: "In the year 2035, traffic noise on The Alameda is predicted to increase by 8 dB. Less than 1 dB of this future noise increase is attributed to project traffic. Therefore, project traffic does not constitute a significant portion of the future increase." It concluded that no mitigation measures were required for project-generated traffic noise because the potential noise impact was less than significant.

On appeal, ACCORD does not attack the third IS/MND's evaluation of the significance of project-generated traffic noise or show that the cited email comments had continuing significance. Those comments criticized a noise study that has been superseded. ACCORD's only criticism of the third IS/MND is that some noise impacts remain "speculative and uncertain." In support of this criticism, it points to statements in the document concerning "project equipment mechanical noise" and "project equipment ambient noise."

The third IS/MND stated that "[t]he project's building would be equipped with heating, ventilation, and air-conditioning equipment and other equipment that could be located in areas exposed to adjacent property lines" and that similarly "[t]he project's building would be equipped with heating, ventilation, and air-conditioning equipment and other equipment that could contribute to a permanent increase in the nearby ambient noise levels." It commented that "[t]he noise levels of project equipment" and "[t]he permanent increase in ambient noise levels due to project equipment" could not "yet be calculated since the equipment locations and model selection have not yet been determined."

36

ACCORD invokes those statements without considering the identified mitigation measures or the third IS/MND's conclusion that noise impacts would be less than significant with incorporated mitigation measures.  The third IS/MND explained:  "To be considered '[n]ormally acceptable' according to the City General Plan and Municipal Code, mechanical noise would need to be limited to DNL 60 dB at the nearest residential property line and DNL 65 dB at the nearby hotel property line.  These noise levels would also satisfy the County General Plan Goal HS-8.11 guidelines."  It also stated that "[t]o meet the draft City Noise Ordinance limits and the County General Plan Goal HS-8.1, noise levels at the nearest residential receivers are to be limited to an hourly Leq of 55 dB and maximum noise level of 70 dB during the daytime hours and hourly Leq 45 dB and a maximum noise level of 65 dB during nighttime hours."[17]

The third IS/MND further stated that "[t]he project's mechanical systems are expected to include common commercial air-conditioning and ventilation equipment," and the proposed mitigation measure was to "[s]elect or mitigate mechanical equipment to meet applicable noise standards."  It indicated that "standard construction methods including selecting quieter equipment models, strategic siting, equipment setback, noise barriers or enclosures, acoustical louvers, and equipment noise attenuators should be sufficient."  It stated that "[a] qualified acoustical professional should be involved during the design phase of the project to advise the design team regarding effective noise reduction measures."

The third IS/MND stated as to project equipment ambient noise: "On-site noise measurements indicate that the existing ambient noise levels at adjacent properties are between DNL 62 dB and DNL 78 dB, which varies by location and proximity to the

---

[17] In Appendix A of the April 18, 2016 noise study, $L_{eq}$ was explained as follows: "In simple but accurate technical language, the $L_{eq}$ is the average A-weighted sound level in a stated time period.  The $L_{eq}$ is particularly useful in describing the subjective change in an environment where the source of noise remains the same but there is change in the level of activity."

37

roadways.  To reduce the impact of mechanical equipment, it must be designed such that noise levels do not increase by three decibels or more at adjacent properties.  Specific equipment plans have not been developed, and it is possible that mechanical equipment could exceed the threshold.  Project equipment that generates a noise level of DNL 62 dB at the southern property line would be expected to increase ambient noise levels by up to three decibels.  Therefore, project equipment that might generate noise exceeding DNL 62 dB at adjacent properties is to be evaluated further.  Additional measures are to be incorporated to reduce equipment noise to DNL 62 dB or quieter." The third IS/MND proposed the identical mitigation measure for project equipment ambient noise that it had for project equipment mechanical noise, "including selecting quieter equipment models, strategic siting, equipment setback, noise barriers or enclosures, acoustical louvers, and equipment noise attenuators" and using a qualified acoustical professional during the design phase.

ACCORD does not directly challenge the thresholds of significance used in the third IS/MND or establish that their use constituted an abuse of discretion.[18]  The third IS/MND expressly concluded that potential noise effects were less than significant with the mitigation measures.  ACCORD claims, without any further citation to the record, that "[r]ecord evidence demonstrates that the [p]roject will cause significant (but not thoroughly understood) noise impacts, that the proposed mitigation measures may be infeasible or ineffective, and that an EIR is required."  But ACCORD has not directed us

_____

[18] "A threshold of significance is an identifiable quantitative, qualitative or performance level of a particular environmental effect, non-compliance with which means the effect will normally be determined to be significant by the agency and compliance with which means the effect normally will be determined to be less than significant." (Guidelines, § 15064.7, subd. (a))  "Each public agency is encouraged to develop and publish thresholds of significance that the agency uses in the determination of the significance of environmental effects." (*Ibid.*)  "Thresholds of significance to be adopted for general use as part of the lead agency's environmental review process must be adopted by ordinance, resolution, rule, or regulation, and developed through a public review process and be supported by substantial evidence." (*Ibid.*, subd. (b).)

to any evidence in the record showing that the noise mitigation measures identified in the third IS/MND would be infeasible or ineffective.  ACCORD has not shown that the third IS/MND improperly deferred determination of the mitigation specifics or that respondents were not committed to the implementation of the identified mitigation measures to ensure that any potential noise impacts would be insignificant based on the stated standards.[19]  (See *Laurel Heights Improvement Assn. v. Regents of University of California* (1988) 47 Cal.3d 376, 418 [upholding noise mitigation measures identified in EIR]; see also *Sacramento Old City Assn. v. City Council* (1991) 229 Cal.App.3d 1011, 1028-1029 [" 'For kinds of impacts for which mitigation is known to be feasible, but where practical considerations prohibit devising such measures early in the planning process . . . , the agency can commit itself to eventually devising measures that will satisfy specific performance criteria articulated at the time of project approval. . . .' [Citation.]"].)

"An EIR is not required on any project proposed to be carried out or approved unless substantial evidence in light of the whole record supports a fair argument that the proposed project may have a significant effect on the environment.  (*Laurel Heights Improvement Assn. v. Regents of University of California* (1993) 6 Cal.4th 1112, 1123.) . . . [Citations.]  The burden is on the petitioner to demonstrate by citation to the record the existence of such substantial evidence.  [Citation.]" (*Citizens for Responsible Development v. City of West Hollywood* (1995) 39 Cal.App.4th 490, 498-499, fn. omitted; see *Jensen v. City of Santa Rosa* (2018) 23 Cal.App.5th 877, 886.) ACCORD bore "the burden of identifying in the record substantial evidence of a fair argument that the project may have a significant effect on the environment that would not

---

[19] Section 21081.6 requires the public agency to "provide that measures to mitigate or avoid significant effects on the environment are fully enforceable through permit conditions, agreements, or other measures" (*id*., subd. (b)) and adopt a mitigation monitoring program "designed to ensure compliance during project implementation" (*id*., subd. (a)(1); see Guidelines, § 15097, subd. (a).)

be mitigated.  (See *Citizens for Responsible and Open Government v. City of Grand Terrace* (2008) 160 Cal.App.4th 1323, 1332.)"  (*Clews Land & Livestock, LLC v. City of San Diego* (2017) 19 Cal.App.5th 161, 193.)  ACCORD has not carried its burden on appeal.

## DISPOSITION

The December 12, 2016 order is affirmed.

                                                     _____

                                                     ELIA, ACTING P. J.

WE CONCUR:


_____

BAMATTRE-MANOUKIAN, J.


_____

MIHARA, J.


*Alliance of Concerned Citizens Organized v. City of San Juan Bautista* H044410

Trial Court:                                          San Benito County Superior Court
                                                      Superior Court No.:  CU-14-00166


Trial Judge:                                          The Honorable Steven R. Sanders



Attorneys for Plaintiff and Appellant                SSL Law Firm LLP
Alliance of Concerned Citizens Organized
for Responsible Development:                          Andrew F. Brimmer
                                                      Zachary R. Walton
                                                      Elizabeth L. Bridges
                                                      Robert B. Martin III



Attorneys for Defendants and Respondents             Wellington Law Offices
City of San Juan Bautista et al.:
                                                      Deborah Mall



Attorneys for Real Party in Interest                 Anthony Lombardo & Associates
Harbhajan Dadwal:
                                                      Anthony L. Lombardo
                                                      Cody J. Phillips



*Alliance of Concerned Citizens Organized v. City of San Juan Bautista*
H044410